[Civ. No. 68778. Second Dist., Div. Three. Jan. 19, 1984.]

DALE ANDRE LEE EVERETT, a Minor, etc., et al.,
Plaintiffs and Appellants, v.
CHAD EVERETT, Defendant and Respondent.

**[Opinion certified for partial publication.†]**

†Certified for publication, except for Contentions on Appeal, Nos. 3, 4, and 5 (*post,* p. 1061), and Discussion, parts III through VII (*post,* p. 1075). California Rules of Court, rule 976.1.

**COUNSEL**

Sheila Scott, in pro. per., Caryl Warner, Lorraine C. Gollub, Joan Celia Lavine and Jeffrey C. Lee for Plaintiffs and Appellants.

Attorney General, Norman H. Sokolow and Andrew D. Amerson, Deputy Attorneys General, William A. Richmond, District Attorney (Tulare), Gary H. Evans and John S. Higgins, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiffs and Appellants.

Mitchell, Silberberg & Knupp, Edward M. Medvene, Marilyn E. Levine, Michael Barclay and Daniel A. Weber for Defendant and Respondent.

**OPINION**

**LUI, J.—**

### SUMMARY

In this appeal, we affirm a judgment following a jury verdict finding the defendant and respondent not to be the father of the minor child.

### STATEMENT OF THE CASE

In September 1973, appellant Sheila Scott (Scott) filed a paternity action (referred to hereinafter as the original action) against respondent Chad Everett (Everett) alleging him to be the father of her minor child Dale Everett (Dale). Following a five-day jury trial, the parties settled the original action, stipulating to a judgment that provided, among other things, that Everett was not the father of Dale. Scott waived her right to move for a new trial and her right to appeal. Everett agreed to pay Scott a lump sum of $5,000 and her attorney's fees of $27,500, and to purchase an annuity policy which would generate monthly payments of $275 to Scott for the benefit of Dale until he reached 18 years of age. Dale was neither party to the original action nor to the settlement.

In July 1974, Dale's guardian ad litem brought the instant action against both Scott and Everett under Civil Code section 231[1] to establish that Everett was his natural father. In the second count, Dale alleged that the prior settlement between his mother and Everett in the original action was the product of collusion[2] and that the settlement was not binding on him. He

---

[1] Former Civil Code section 231 is now Civil Code section 7006.

[2] "Specifically, the collusion alleged was that plaintiff's mother failed to produce him in court even though he resembled defendant, agreed not to testify personally, agreed to permit defendant 'to testify and deny fatherhood without voiced contradiction' [fn. omitted]; agreed to and did not bring any supporting witnesses, and signed the stipulation embodied in the judgment recited above." (*Everett* v. *Everett* (1976) 57 Cal.App.3d 65, 68 [129 Cal.Rptr. 8].)

further alleged that the judgment in the original action did not affect his rights because no guardian ad litem had been appointed for him and that the compromise of his claims had not been approved by the trial court.

The trial court sustained Everett's demurrer to the complaint on the ground that the original action was res judicata on the issue of whether Everett was Dale's father and granted judgment in favor of Everett. Division five of this district reversed, holding that the compromise judgment, although valid between the parties, had not been approved by the court pursuant to the provisions of Probate Code section 1431[3] and was therefore not binding upon the minor. (*Everett* v. *Everett* (1976) 57 Cal.App.3d 65, 69 [129 Cal.Rptr. 8] (*Everett I*); see also *DeSylva* v. *Ballentine* (1950) 96 Cal.App.2d 503, 510 [215 P.2d 780].)

In 1978, Dale's action was resumed in the superior court. Over Dale's objection, Everett presented the testimony of Judge Benjamin Landis, the trial judge in the original action, who testified that he had approved the settlement as being in the best interests of the minor. Concluding that the settlement had not been the result of collusion, coercion or other infirmity of Dale's rights, and had been approved by the court, and that it was not necessary to file a petition pursuant to Probate Code section 1431, the trial court dismissed Dale's action. This division reversed, holding that the minor's claims were not barred by the original action since he had not been represented by a guardian ad litem in that action. We held that the trial court erred in concluding that (1) a petition pursuant to Probate Code section 1431 was unnecessary and (2) that the earlier stipulated judgment was binding on Dale. (*Everett* v. *Everett* (Sept. 7, 1979) 2 Civ. 55356 [unpub. opn.] at p. 3 (*Everett II*).)

Dale's action was remanded to the superior court for trial and Scott was realigned as a party-plaintiff. The matter proceeded to trial on October 19, 1981. Subsequently, the jury returned a verdict in favor of Everett, finding him not to be Dale's father.

Dale's motion for a new trial was denied and he filed a timely notice of appeal.

---

[3]Probate Code section 1431 was repealed by Statutes 1979, chapter 726, section 1, page 2334, but was substantially reenacted as Probate Code section 3500. Probate Code section 1431 provided: "When a minor has a disputed claim for damages, money or other property against a third person, . . . that parent having the care, custody, or control of the minor, . . . shall have the right to compromise, . . . but before the compromise or covenant is valid it must be approved by the superior court of the county where the minor resides, . . . ." (Stats. 1975, ch. 718, § 8, p. 1709.)

## Factual Background[4]

From late 1970 through mid-1972, Scott worked intermittently as an extra on the set of the television series "Medical Center." During this time, she met Everett, who at the time played the leading role of "Dr. Joe Gannon."[5] Scott testified that she worked on the series a total of approximately 30 times and that she had a 6-month hiatus from the series between December 1971, and July 1972. In 1972, she worked on the series only two days. She testified that during the period she worked on the series, an intimate relationship developed between her and Everett. Everett specifically requested Scott as an extra a number of times, invited her to dinner on several occasions, was publicly affectionate towards her, and engaged in sexual activity short of intercourse with her in his dressing room on the set. Scott further testified that this intimate relationship culminated in sexual intercourse on August 16, 1972, when Everett took Scott home to her apartment, and that as a result, she conceived Dale. She also testified that she did not engage in sexual intercourse with any other man in 1972.

On or about August 22, 1972, Scott took her son, Glen, by a prior marriage, on a cruise to Greece. Upon her return September 21, 1972, she learned of her pregnancy and contacted Everett, who was initially pleased and very understanding but later refused to admit paternity.

Throughout her testimony, Scott referred to her 1972 appointment book or diary to refresh her recollection as to dates, events, appointments, and various other notations. One notation which appeared regularly was the word "Siam," which, Scott testified, meant the onset of her menstrual period. According to her February 1973 deposition,[6] Scott entered the word

---

[4]The factual accounts of Scott and Everett as to the parties' relationship and what actually occurred between them on August 16, 1972, and afterwards are divergent as to nearly every material issue in the case. The fundamental issue in dispute concerns Scott's contention that the parties had intercourse on August 16, 1972, and that she conceived Dale as a result. Everett maintains that he and Scott never had intercourse. We shall highlight some of the conflicting testimony presented to the jury which relates to the parties' contentions on appeal.

[5]On direct examination, Scott testified that she had started on "Medical Center" when Everett specifically requested her and introduced her to the assistant directors, telling them to hire her. However, during cross-examination, a portion of Scott's February 9, 1973, deposition (see fn. 6, *infra*) was read in which she had said she met Everett on the set of "Medical Center" when she had a "bit part" on the show.

[6]Scott was deposed on February 8 and 9, 1973, before giving birth to Dale. Much of this deposition was read during trial to impeach Scott's testimony. Scott explained the discrepancies between her deposition testimony and her testimony at trial as being due to the fact that at the time of that deposition, she was on the verge of an emotional collapse and was confused and unable to testify accurately to many of the details of the events of 1972. Scott

"Siam" on the day she began menstruating, although at trial she denied routinely entering it on the first day. According to entries in the diary, Scott's menstrual period in the months preceding conception began on June 18, July 10, and August 7. In her February 1973 deposition and at trial, she testified that she had a regular twenty-nine-day cycle and that her period generally lasted five to six days.

On cross-examination, it was revealed that the dates of June 18, July 10, and August 7, were not the only dates the word "Siam" appeared in the diary. On the date July 17, 29 days after June 18, the word "Siam" appeared in blue ink, and was crossed out in green ink. The entries of "Siam" that appeared on July 10 and again on August 7 were also written in green ink. In addition, the phrase "Siam at 20th begins" also appeared on July 17 for which Scott had no explanation nor even any recollection writing.[7] Finally, the notation "two months" appeared in the diary on October 12, which Scott testified during her February 1973 deposition meant she was two months pregnant at the time.

The essence of Scott's testimony concerning the events of August 16, 1972, was that Everett drove Scott home at about 5:30 p.m. and accompanied her into her apartment as her son Glen was leaving. According to Scott's testimony, Everett stayed in her apartment that night until 10 or 10:30 p.m. and during that four-and-one-half-to-five-hour period they engaged in sexual intercourse, had some drinks and looked at her paintings. After Everett left, Glen returned at 11 p.m.

Everett's testimony to the events and circumstances surrounding Scott's pregnancy and the relationship of the parties conflicted sharply with Scott's testimony. Everett testified that he had never specifically requested Scott as an extra, that he and Scott had never engaged in sexual intimacies either on or off the "Medical Center" set, and that he had never taken her to lunch or dinner or been off the set with her at any time (other than on Aug. 16).

Everett testified that on August 16, 1972, he gave Scott a ride home from the set after work and accompanied her to her apartment to look at some of

testified that several weeks after the initial confrontation between Scott and Everett at which Scott informed Everett she was pregnant, Scott had a meeting with Everett and his attorney at his attorney's office. At this meeting, Everett and his attorney allegedly threatened Scott and told her to have an abortion.

On May 25, 1973, Scott gave birth to Dale and some time afterwards suffered an emotional breakdown.

[7]Scott later testified that "Siam at 20th begins" was a shorthand notation that the series "Anna and the King of Siam" was to begin filming at the studios of 20th Century Fox on July 17. The production sheet admitted into evidence, however, only contained "Anna and the King" on July 17.

her artwork as possible replacements for items which had been destroyed in a fire at his home. On the way to the apartment, Scott introduced Everett to Glen and then Everett and Scott proceeded to the apartment. Everett said that he stayed in Scott's apartment approximately 15 minutes. During that time, he looked at her paintings. He expressly denied having any sexual contact with Scott during that time and also denied having drinks with her or discussing anything other than her paintings. Everett further testified that after leaving Scott's apartment, he went shopping for his wife and was home by 8:30 p.m.

Everett explained that at the meeting at which Scott told him she was pregnant, she stated her plan to claim him as the father and that it would cost him some money. He denied the possibility that the child could be his since he and Scott had never had intercourse. Scott then began making threatening phone calls. At a meeting in December 1972, at which Scott, Everett, and Everett's attorney were present and with Scott's attorney's presence by telephone, Scott threatened to take the story to the newspapers if Everett did not give her more money than the amount offered as a "nuisance offer."[8] Everett testified no one ever suggested an abortion.

Evidence of the 1973 settlement was not admitted at trial. None of the witnesses was permitted to refer to it before the jury. In addition, no evidence was admitted concerning additional blood tests, Everett's reluctance to take a human leukocyte antigen (HLA) paternity blood test, and his refusal to take additional tests.

### CONTENTIONS ON APPEAL

Appellants, supported by the California Attorney General as amicus curiae, contend as follows:

1. The trial court improperly denied Dale's motion for additional blood tests.

2. The jury instructions regarding the HLA probability-of-paternity results improperly weighted the blood test evidence and, in effect, directed a verdict against appellants.

3. - 5.*

---

[8]The "nuisance offer" was $10,000, which Everett considered to be the value of the costs involved in going ahead with a lawsuit—the legal fees and the emotional costs involved such as reading the stories in the press and the emotional burden on his family.

*Not certified for publication, see footnote, *ante*, page 1053.

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

Respondent Everett controverts each contention.

DISCUSSION

I

*Request for Blood Tests Under Evidence Code Section 892*

A. *The Trial Court's Failure to Order the Additional Blood Tests Requested by Appellants Was Not Prejudicial Error*

█ Although the additional blood tests requested by Dale could properly have been ordered by the trial court in July 1981, without unduly delaying the trial, Dale was not prejudiced by the trial court's failure to order the additional tests since they would not have changed the result at trial.

During the course of the two-week trial, the jury was presented with evidence of the HLA blood test results which determined that Everett could not be excluded as the father of Dale, that he was among the 2.8 percent of the male population who could have fathered Dale, and that the probability that he was, in fact, Dale's father was 94.67 percent. Dr. Paul Terasaki, an expert in the field of HLA testing, testified in support of the HLA test and explained the procedures involved in conducting the test and the statistical calculations made to determine the "probability of paternity." Dr. Terasaki stated that in determining the probability of paternity (as opposed to including or excluding the putative father based on genetics from the group of potential fathers which, in this case, was 2.8 percent of the male population) the formula assumes a 50 percent "prior probability of paternity," or a 50 percent probability that the putative father and the mother had intercourse and the child was conceived as a result. He also testified, however, that if the 50 percent were replaced with a different percentage, the probability-of-paternity results could vary considerably. For example, if Everett and Scott did not engage in sexual intercourse, the prior probability of paternity would be 0 percent and the resulting probability of paternity would correspondingly be 0 percent; or, if the 50 percent prior probability of paternity were replaced with a 5 percent prior probability of paternity (reflecting the probability of conception on August 16, given an August 7

onset of Scott's menstrual period), the probability of paternity would be below 50 percent.[9]

The jury also heard the testimony of Dr. Val Davajan, an obstetrician and gynecologist with a specialization in gynecologic endocrinology and infertility, and Dr. Alexander Culiner, Scott's gynecologist during her pregnancy with Dale, on the issue of Scott's fertility cycle in 1972. Dr. Culiner testified that when he measured the height of the fundus (a measurement of the height of the uterus to determine pregnancy) on September 25, 1972, he noted it to be a six-week size, placing the onset of Scott's last menstrual period on or about August 14—seven days later than Scott claimed, and two days prior to the alleged date of conception. Dr. Culiner also testified that since there is a 90 percent likelihood of conception 14-16 days prior to the onset of the next menstrual period, there was only a 5 percent probability of conception occurring on August 16, assuming Scott's menstrual period began August 7, as she had testified.

Both Scott and Everett testified to their relationship while working on the set of "Medical Center," and to the events and circumstances surrounding Scott's pregnancy.

In addition to the extensive testimony and numerous exhibits, the jury also had an opportunity to view Dale and Everett together in the courtroom and observe any similarities or dissimilarities between them.

From the evidence adduced, the jury concluded that Everett was not Dale's father despite the 94.67 percent probability of paternity from the HLA test. Although the jury made no special findings because none were requested, the jury could have resolved the issue of paternity only by finding either that (1) Scott and Everett did not engage in sexual intercourse, thus rejecting Scott's testimony; or (2) if intercourse did take place between Scott and Everett on August 16, 1972, Scott did not conceive at that time.

 Where no special findings are made, the reviewing court may infer that "the jury by its general verdict found for respondent on every issue submitted." (*Philpott* v. *Mitchell* (1963) 219 Cal.App.2d 244, 255 [32 Cal.Rptr. 911].) Specifically, the jury's general verdict "imports findings in favor of the prevailing party on all material issues; and if the evidence supports implied findings on any set of issues which will sustain the verdict, it will be assumed that the jury so found. The court on appeal does not have to speculate on what particular ground the jury may have found in favor of

---

[9]Less than 90 percent probability of paternity is considered a low probability of paternity and is inconclusive in resolving the paternity issue.

the prevailing party." (*Gordon* v. *Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 511 [78 Cal.Rptr. 417, 39 A.L.R.3d 809]; *Kaiser Cement & Gypsum Corp.* v. *Allis-Chalmers Mfg. Co.* (1973) 35 Cal.App.3d 948, 958 [111 Cal.Rptr. 210]; *Hazelwood* v. *Gordon* (1967) 253 Cal.App.2d 178, 180 [61 Cal.Rptr. 115]; *Nigro* v. *West Foods of California* (1963) 218 Cal.App.2d 567, 571 [32 Cal.Rptr. 692].)

■ In the case at bar, there was also substantial evidence to support a finding that Scott and Everett never engaged in sexual intercourse on August 16, 1972, as alleged. Since the jury could have resolved the issue of paternity on that theory alone, the failure to order the additional blood tests could not have been prejudicial to appellant. Because appellant did not sustain his burden of first proving sexual intercourse had taken place before reaching the issue of paternity using evidence of the blood test results, the result would not have been different had the additional blood tests been ordered. The trial court's error in refusing to order such tests was therefore not prejudicial error. (Code Civ. Proc., § 475; *Steiner* v. *Rowley* (1950) 35 Cal.2d 713, 719 [221 P.2d 9]; *Escamilla* v. *Marshburn Brothers* (1975) 48 Cal.App.3d 472, 480-481 [121 Cal.Rptr. 891]; *Marr* v. *Postal Union Life Ins. Co.* (1940) 40 Cal.App.2d 673, 686 [105 P.2d 649].)

B. ■ *In an Action to Determine the Paternity of a Child, Pursuant to Evidence Code Section 892,[10] Any Blood Tests Requested by a Party That Are Relevant to Establishing Paternity Must Be Ordered by the Court*

Here, the trial court's refusal to order the additional blood tests requested by Dale was not prejudicial. Such blood tests requested by a party pursuant to section 892 must be ordered by the trial court absent a showing of extreme hardship. While the requirement to order blood tests is quite broad under section 892, it is not unlimited. We shall therefore endeavor to provide some guidance to the trial courts in interpreting the requirements of section 892.[11]

As our Supreme Court has observed, "[a] determination of paternity has grave implications for all concerned—the alleged father, the child, the mother and the state. This court has termed the interest in maintaining a parent-

---

[10]Hereinafter, all references shall be to the Evidence Code unless otherwise indicated.

[11]While we are only taking the next logical step after *County of Fresno* v. *Superior Court* (1979) 92 Cal.App.3d 133 [154 Cal.Rptr. 660], in requiring trial courts to order additional blood tests requested by a party, we do not base that requirement on section 893 as the appellate court did in *County of Fresno*. Rather, we rely on the provisions of section 892. Although we agree with the result reached in *County of Fresno*, we question that court's reliance on section 893 in making the order of HLA test mandatory by the trial court upon request of a party.

child relationship 'a compelling one, ranked among the most basic of civil rights. . . .' [Citations.] Freedom from an incorrect imposition of that relationship on either a parent or a child is an equally compelling interest." (*Salas* v. *Cortez* (1979) 24 Cal.3d 22, 28 [154 Cal.Rptr. 529, 593 P.2d 226].) Public policy mandates the use of the most reliable and objective evidence available to determine the parentage of a child whose interests are at stake in a disputed paternity proceeding. Such evidence is usually in the form of the results of blood tests of the alleged father, the mother and the child, which, based on genetics, either exclude or include the alleged father in the group of possible fathers.

Since California's adoption of the Uniform Act on Blood Tests to Determine Paternity (Uniform Act) (§§ 890-897) in 1953, the number and accuracy of the blood typing procedures (blood tests) available to determine the likelihood of paternity have increased dramatically. (See generally, Sterlek & Jacobson, *Paternity Testing with the Human Leukocyte Antigen System: A Medicolegal Breakthrough* (1980) 20 Santa Clara L.Rev. 511 (*Paternity Testing*).) At the time the Uniform Act was adopted, only the Landsteiner series of red cell blood grouping tests had been endorsed by the American Medical Association as sufficiently accepted within the scientific community to be legally valid. (*Cramer* v. *Morrison* (1979) 88 Cal.App.3d 873, 881 [153 Cal.Rptr. 865].) These tests, which include the ABO, MN and Rh-Hr systems, [12] utilize only a limited number of genetic factors, and when applied together, the probability of excluding a mistakenly accused defendant is only 53.9 percent.[13] (*Paternity Testing, supra,* at p. 512, fn. 6.) Since such test results are quite inconclusive indicators of the likelihood of paternity, they have been held inadmissible as affirmative proof of paternity. (Witkin, Cal. Evidence (2d ed. 1966) § 660, p. 620.)

---

[12]The ABO, MN, and Rh-Hr blood grouping systems type only red blood cells. Under each system, the blood is classified into one of several groups according to particular characteristics of the blood which the tests identify. The ABO system groups blood into four types: A, B, AB, and O; the MN system classifies blood as type M, N, or MN; and under the Rh-Hr system, blood is grouped as Rh, rh', rh", hr', or hr". (*Paternity Testing, supra,* 20 Santa Clara L.Rev. 511, 512, fn. 6; for a more detailed discussion of these blood grouping systems and others, see *Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage* (1976) 10 Fam.L.Q. 247.)

All of the blood grouping systems used to determine paternity are based on the fact that certain genetic markers present in the blood are inherited directly from each parent. A man can be excluded from the group of possible fathers of a child if he shares none of the genetic markers (identified by one blood grouping system) that the child has. If he and the child share certain genetic markers which the child could not have received from the mother, however, he is included in the group of possible fathers of the child. The size of that group will depend upon the number of markers the particular system utilized and how frequently a given blood type occurs in the general population.

[13]While the Landsteiner Series yields only inconclusive results on the likelihood of paternity, it is regarded as conclusive in its showing of nonpaternity. (§ 895; Witkin, Cal. Evidence (2d ed. 1966) § 660, p. 620.)

There are now as many as 62 blood typing procedures which, if applied in combination, would establish nonpaternity for approximately 98 percent of the mistakenly accused men. (*Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage* (1976) 10 Fam. L.Q. 247, 252 (*Status of Serologic Testing*).) Despite the rapid growth in this field of genetic research and the significant increase in the ability of such tests to exclude men who could not be the father and to indicate the probability of paternity of those men not so excluded, test results which did not exclude the alleged father continued to be held inadmissible until 1979.

In 1979, the court in *Cramer v. Morrison, supra,* 88 Cal.App.3d 873, held admissible the results of an HLA test to prove paternity, distinguishing the HLA test involved in that case from the tests involved in *Dodd v. Henkel* (1978) 84 Cal.App.3d 604 [148 Cal.Rptr. 780], decided a year earlier. In *Dodd,* the court held blood tests could not be used affirmatively to prove paternity. The *Dodd* court had interpreted the Legislature's omission of the last sentence from section 4 of the Uniform Act enacted as section 895, which placed admission of evidence of the probability of paternity within the discretion of the trial court, as a clear manifestation of legislative intent to reject the affirmative use of blood test evidence as proof of paternity. The *Cramer* court, concluding "that California law does not compel exclusion of the results of the HLA test to prove paternity," (*Cramer v. Morrison, supra,* 88 Cal.App.3d at p. 883), however, interpreted the omission from section 895 to refer not to the white blood cell typing tests such as the HLA test, but only to the traditional Landsteiner series tests which were involved in *Dodd* (*Id.,* at pp. 881-882.)

Four months after *Cramer* was decided, the court in *County of Fresno v. Superior Court* (1979) 92 Cal.App.3d 133 [154 Cal.Rptr. 660], dealt with the question of the trial court's discretion to deny a motion under section 893 for an HLA test. The court determined in light of the HLA test's admissibility under *Cramer* and the language of section 893, "that the court has no discretion to deny an HLA test upon demand of any party or person at whose suggestion an original extended factor test has been ordered." (*Id.,* at p. 137.) Finally, in 1981, the Legislature removed any lingering uncertainty as to the admissibility of test results which fail to exclude the alleged father by amending section 895 to permit affirmative use of blood tests to prove paternity. (Stats. 1981, ch. 266, § 1, p. 1355.)

Given the acceptance of the HLA test and other tests in the scientific community and their admissibility at trial to prove paternity, provided a proper foundation is laid, the question arises as to what blood tests a trial court must order at the request of a party or on its own motion pursuant to section 892. Insofar as the traditional extended blood factor tests and the

HLA test are concerned, the trial court has little discretion to refuse to order these tests, providing a timely request is made by a party. (*Huntingdon* v. *Crowley* (1966) 64 Cal.2d 647, 652 [51 Cal.Rptr. 254, 414 P.2d 382]; *County of Fresno* v. *Superior Court, supra,* 92 Cal.App.3d 133, 137; *Shults* v. *Superior Court* (1980) 113 Cal.App.3d 696, 699 [170 Cal.Rptr. 297]; *People* v. *Bynon* (1956) 146 Cal.App.2d 7, 14 [303 P.2d 75].) With respect to other tests yet to be developed or fully accepted in the scientific community, we interpret the provisions of section 892 to be mandatory in requiring the trial court to order the mother, child, and alleged father to submit to any blood tests requested by a party upon a timely motion, and discretionary only when the trial court orders blood tests on its own initiative.

However, since, as we noted above, as many as 62 blood typing procedures are available, with certainly more yet to be developed, and since application of all 62 tests is neither feasible nor cost-effective,[14] the trial court must strike a balance between the costs involved, the danger of harassment, the inconvenience to the parties on the one hand, and the increased ability to determine paternity based on the cumulative effect of the results from a number of tests on the other hand. Many of the immunologic and biochemical blood tests available to aid in determining paternity are extremely costly and/or can be administered only in a limited number of laboratories around the country; some of the results of such tests may add little to the likelihood of determining that a certain man is not the father. If an objection is made to a request for a specific test, the party seeking such test must make a minimal showing that the probative value of the results will outweigh the financial burden and inconvenience to the party sought to be tested; if such showing is not made, the trial court may properly reject the request. In addition, repeated requests for additional blood tests, each requiring the party to have blood drawn anew, which are calculated to annoy, harass, or embarrass a party rather than to produce reliable scientific evidence, may also be denied by the trial court, in the same vein that the trial court may deny discovery motions designed to annoy, embarrass or oppress. (See Code Civ. Proc., § 2019, subd. (b)(1); *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 373 [15 Cal.Rptr. 90, 364 P.2d 266].)

By requiring trial courts to order more than one blood test, we are by no means ruling on the admissibility of such tests. Rather, we hold that section

---

[14]While application of all 62 systems would yield a probability of exclusion of 98 percent, the cost to administer and conduct so many tests would be prohibitive. Application of as few as 7 of those 62 tests, however, would cost considerably less and would yield a probability of exclusion only 5-7 percent lower than use of all 62. (*Status of Serologic Testing, supra,* 10 Fam. L.Q. 247, 257.) The seven systems the authors of the article recommend are ABO, Rh, MNSs, Kell, Duffy, Kidd, and HLA. (*Ibid.*)

892 dictates the ordering of blood tests when requested, provided a balance is struck between the necessity for such evidence and the inconvenience and costs of such testing to the parties. But, the *results of the tests are still subject to the usual rules of evidence, and their admissibility depends upon a showing of relevance and the laying of an adequate foundation in the forum of a pretrial evidentiary hearing.* As the court in *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013, 1014 [34 A.L.R. 145] declared: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (See also *United States* v. *Distler* (6th Cir. 1981) 671 F.2d 954, 961; *United States* v. *Stifel* (6th Cir. 1970) 433 F.2d 431, 438, cert. den., 401 U.S. 994 [28 L.Ed.2d 531, 91 S.Ct. 1232].)

II

*The Jury Instructions Regarding the HLA Probability of Paternity Results Were Proper*

 Dale vigorously contends that the jury instructions concerning the HLA blood test results[15] were prejudicial and deprived him of his right to

---

[15]The instructions concerning the HLA blood test results were plaintiff's A, defendant's 7, and defendant's 8, read to the jury in sequence.

Plaintiff's A: "You are instructed that the HLA test results shall be considered by you as evidence in this case, along with all of the other evidence in this case, in reaching your verdict."

Defendant's 7: "Evidence of the HLA blood test has been introduced and, based on that evidence an opinion has been expressed concerning the degree of probability that Mr. Everett is the father of the minor. You must bear in mind that the probability of paternity results of this blood test are in part based upon the assumption that there is a 50 percent chance that Mr. Everett is the minor's father, and a 50 percent chance that a random man is the minor's father. [¶] You must therefore bear in mind that neither the making of such an assumption, nor the probability of paternity results, constitute any evidence that Mr. Everett had sexual intercourse with Ms. Scott at or about the time the minor was conceived. [¶] Therefore, in determining whether Mr. Everett had sexual intercourse with Ms. Scott at or about the time when, according to the usual laws of nature, the child was conceived, you must disregard the probability of paternity results. If the plaintiff has failed to prove to your satisfaction by a preponderance of the evidence independently of the probability of paternity results that Mr. Everett had sexual intercourse with Ms. Scott at or about the time when, according to the usual laws of nature, the minor was conceived, then regardless of the HLA probability of paternity results, you must find that Mr. Everett is not the minor's father."

Defendant's 8: "If you find that Mr. Everett had sexual intercourse with Ms. Scott at or about the time when, according to the usual laws of nature, the child was conceived, you may then consider the probability of paternity results. [¶] In considering whether Mr. Everett is the father of the minor, you are the sole judges of the weight, if any, to be given to the blood test results and the opinions expressed concerning them."

a jury trial because the instructions invaded the province of the jury to determine the weight to be given to the HLA blood test results and in effect directed a verdict against him and Scott. We find Dale's contentions regarding the jury instructions without merit.

Dale first contends that the portion of defendant's instruction number 7 dealing with the assumption inherent in the probability-of-paternity statistic, i.e., that there is a 50 percent chance that Everett is the father of the child, relieved the jury of its duty to weigh the evidence. Dale further argues that this instruction improperly emphasized one part of the evidence in favor of the defendant and that this is cause for reversal. We disagree.

Both experts on the HLA probability-of-paternity results, Dr. Terasaki and Dr. Mickey, the statistician in the Terasaki laboratory, testified that the statistical formula used to determine the probability of paternity assumes that there is a 50 percent chance that the defendant and mother had intercourse and that the defendant is indeed the father of the child. The experts further testified that the 50 percent assumption has no scientific basis, but is employed precisely because nothing is known about whether intercourse actually took place between the parties at a time when conception could have occurred. Since, however, the two issues—whether intercourse took place between Scott and Everett at all, and whether it occurred at a time when Scott could have conceived—were the primary issues in dispute in this case, it would have been improper to allow the jury to take the probability-of-paternity result at face value without also considering the underlying premise upon which it was based.

When the relevance of evidence before the jury depends upon the validity of an underlying assumption (i.e., a 50 percent chance that the alleged father and the mother had intercourse), the jury must be instructed to determine whether the assumption is valid and to disregard the evidence if it finds such assumption invalid. The validity of such an assumption is akin to a finding of the existence of a preliminary fact. (§ 403, subd. (c)(1).) Where statistical evidence is derived from a formula which relies upon certain factual assumptions, the accuracy of those assumptions must be determined by the jury as a preliminary fact before the statistical evidence may be accorded any weight. In the case of the HLA probability-of-paternity results, the 94.67 percent probability of paternity is irrelevant if the prior probability of paternity of 50 percent that is employed in the formula is not correct. In order for the jury to properly assess such statistical evidence, it had to first evaluate the correctness of the 50 percent assumption inherent in the formula. If it then found that assumption to be accurate, it could give due weight to the 94.67 percent probability of paternity accordingly; but, if

it found the assumption to be invalid, it could accord less weight or disregard altogether the probability of paternity results.

Because the 50 percent prior probability-of-paternity assumption is not based on empirical facts, but rather, is employed to make the probability-of-paternity formula work, the probability of paternity results may not be considered reliable in cases where the occurrence of intercourse and the likelihood of conception at a given time are in dispute. Such was the case in *Alinda V.* v. *Alfredo V.* (1981) 125 Cal.App.3d 98 [177 Cal.Rptr. 839], where the trial court found that the 98.95 percent probability of paternity from the HLA test was "inaccurate and not entitled to any evidentiary weight." (*Id.,* at p. 101.) Concluding that the trial court's finding of fact was correct, the appellate court observed: The "evidence [of the 98.95 percent probability of paternity] was presented by the medical technologist from the university laboratory whose knowledge of the case was limited to the blood typing. She did not know the extent or nature of the other evidence to be introduced at trial and she was not in a position to weigh the evidence and make a mathematical determination of the probability of paternity."[16] (*Ibid.*)

The instruction in the case at bar did not place undue emphasis on the evidence of the 50 percent prior probability-of-paternity assumption used in the probability of paternity formula, but rather, merely highlighted the jury's duty to consider the accuracy of that assumption before giving weight to the probability-of-paternity statistic. Dale's reliance on *Huntingdon* v. *Crowley, supra,* 64 Cal.2d 647, 660-661, for the proposition that the instruction directed a verdict against him is misplaced. In *Huntingdon,* the defective instruction omitted one of the two elements the jury must consider in determining whether the mother had sexual intercourse with any man other than defendant at a time when she could have conceived. (*Id.,* at p. 657.) A note from the jury during deliberations clearly indicated the jury considered the instruction mandatory and would have returned a different verdict had it had "any other choice." (*Id.,* at p. 660.) Since it was reasonably certain a different result would have been reached but for the defective instruction, the appellate court reversed. ■ In the case before us, the instruction in question is neither defective nor does it mandate any particular result. Dale's argument that it directed a verdict against him cannot stand.

---

[16]Appellant attempts to distinguish the case at bar from *Alinda V.* on the ground that in this case two experts and the laboratory technicians testified in support of the test results, whereas in *Alinda V.* only the laboratory technician testified. Such a distinction is not valid. Although Drs. Terasaki and Mickey are experts in the fields of HLA testing and statistical calculations, respectively, like the laboratory technician in *Alinda V.,* neither knew the extent or nature of the evidence to be presented at trial and neither knew anything about the specific facts of the case or points of dispute.

■ Dale next maintains that the admonition in defendant's instruction number 7 that neither the making of the 50 percent prior probability-of-paternity assumption nor the probability-of-paternity results constitute any evidence that intercourse occurred at or about the time the minor was conceived directed a verdict against plaintiffs and was contrary to the requirements of section 895. We find this contention lacking in merit as well.

At trial, Dale was allowed to argue that the inclusionary results of the HLA blood test (i.e., that Everett was among the 2.8 percent of the population of potential fathers) constituted circumstantial evidence that intercourse had occurred since it corroborated Scott's testimony. That evidence was then submitted to the jury along with all the other evidence pursuant to section 895. The trial court instructed the jury, pursuant to defendant's instruction number 7, that the probability-of-paternity results and the assumptions upon which they were based were not circumstantial evidence of intercourse, but did not address the inclusionary results at all except in plaintiff's instruction number A.

As the *Alinda V.* court observed, "[t]here is a very material difference between the test result and the statistical result of probability of paternity. The evidence was uncontradicted that an HLA test could show that a defendant biologically could not be the father or it could show that a defendant is biologically within the class that could be the father. A blood test could not show that the defendant was the father." (*Alinda V.* v. *Alfredo V., supra,* 125 Cal.App.3d 98, at p. 101.) The inclusionary result could be and was considered by the jury with the other evidence as circumstantial evidence that intercourse had taken place. However, to infer from the probability of paternity results, which *assume* intercourse had occurred, that indeed Everett and Scott engaged in sexual intercourse is clearly a bootstrapping enterprise, and the trial court properly circumvented this endeavor.

Defendant's instruction number 7 was also consistent with the terms of section 895, which provides: "If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, *or if the tests show the probability of the alleged father's paternity,* the question, *subject to the provisions of Section 352,* shall be submitted upon all the evidence, *including evidence based upon the tests.*"[17]

---

[17]Section 895 was amended in 1981 by adding the emphasized portions. (Stats. 1981, ch. 266, § 1, p. 1355.) As amended, it did not become effective until January 1, 1982, and was therefore without any bearing on this case. (*Kennelly* v. *Lowery* (1944) 64 Cal.App.2d 903, 904-905 [149 P.2d 476].) We hold, however, that the jury instructions and submission of the evidence to the jury comported with the terms of section 895 even as amended.

The question which section 895 requires be submitted upon all the evidence, including evidence based upon the tests, is not the question whether sexual intercourse took place between the mother and the alleged father, as Dale contends, but rather, the question of paternity. There is no requirement in section 895 or elsewhere that the preliminary fact question whether intercourse occurred be submitted upon evidence which assumes the answer that it purports to prove.

■ Dale further takes exception to the court's instruction that the jury find independently of the probability-of-paternity results that Everett and Scott had intercourse at or about the time Scott could have conceived, and if the jury did not so find, then regardless of the probability-of-paternity results, it would have to find for defendant. Dale argues that this portion of defendant's instruction number 7 also directed a verdict against plaintiffs. We find this contention unpersuasive.

This portion of defendant's instruction number 7 was clearly mandated by section 403, subdivision (c)(1).[18] (See also *Verzan v. McGregor* (1863)

[18]Section 403 provides in relevant part: "(c) If the court admits the proffered evidence under this section, the court: [¶] (1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist."

The Assembly Committee on Judiciary's Comments to section 403, subdivision (c), addresses the very problem presented to the trial court in the instant appeal. If the evidence on the facts of sexual intercourse and the timing thereof between Everett and Scott was in conflict, the jury was to decide these facts before it was to consider the test results. The comments state: "Subdivision (c) relates to the instructions to be given the jury when evidence is admitted whose admissibility depends on the existence of a preliminary fact determined under Section 403. When such evidence is admitted, the jury is required to make the ultimate determination of the existence of the preliminary fact. Unless the jury is persuaded that the preliminary fact exists, it is not permitted to consider the evidence.

"For example, if P offers evidence of his negotiations with A in his contract action against D, the judge must admit the evidence if there is other evidence sufficient to sustain a finding that A was D's agent. If the jury is not persuaded that A was in fact D's agent, then it is not permitted to consider the evidence of the negotiations with A in determining D's liability.

"Frequently, the jury's duty to disregard conditionally admissible evidence when it is not persuaded of the existence of the preliminary fact on which relevancy is conditioned is so clear that an instruction to this effect is unnecessary. For example, if the disputed preliminary fact is the authenticity of a deed, it hardly seems necessary to instruct the jury to disregard the deed if it should find that the deed is not genuine. No rational jury could find the deed to be spurious and, yet, to be still effective to transfer title from the purported grantor.

"At times, however, it is not quite so clear that conditionally admissible evidence should be disregarded unless the preliminary fact is found to exist. In such cases, the jury should be appropriately instructed. For example, the theory upon which agent's and co-conspirator's statements are admissible is that the party is vicariously responsible for the acts and statements of agents and co-conspirators within the scope of the agency or conspiracy. Yet, it is not always clear that statements made by a purported agent or co-conspirator should be disregarded if not made in furtherance of the agency or conspiracy. Hence, the jury should be instructed to disregard such statements unless it is persuaded that the statements were made within the scope of the agency or conspiracy. People v. Geiger, 49 Cal. 643, 649 (1875); People v. Talbott, 65 Cal.App.2d 654, 663, 151 P.2d 317, 322 (1944). Subdivision (c), therefore, permits the judge in any case to instruct the jury to disregard conditionally

23 Cal. 339, 342-343.) There were two preliminary facts that the jury had to find in order for the probability-of-paternity results to be relevant: (1) that Everett and Scott engaged in sexual intercourse, and (2) if sexual intercourse took place, that it occurred at a time when, according to the laws of nature, Scott could have conceived. A failure to find either preliminary fact would render the probability of paternity results totally irrelevant. Section 403 requires an instruction that the jury disregard the proffered evidence unless it finds the preliminary fact to exist when such an instruction is requested. In this case, defendant's instruction number 7 correctly stated the law and the trial court properly gave it. The instruction was neither improper, nor prejudicial, nor did it direct a verdict.

Finally, Dale maintains that instructions A, 7 and 8, taken together, were contradictory and confusing and therefore constituted reversible error. This contention also fails to convince us.

Dale offered instruction A on November 2, 1981, moments before the instructions were read to the jury. Most of the other proffered jury instructions had been submitted before the start of trial on September 25, and none concerning the HLA test results were submitted by Dale at that time. The HLA test results were ruled admissible at the conclusion of the section 402 hearing on October 16, and defendant subsequently submitted two instructions on the HLA test results. Dale still did not submit any instruction on the HLA test results.

On October 30, 1981, prior to closing arguments, a conference to discuss proffered jury instructions was held at which all counsel for the parties were present and Dale objected to Everett's proposed instructions 7 and 8 then. Dale still did not provide an instruction on the HLA test results. Pursuant to Dale's objections to defendant's instructions 7 and 8, Everett modified both instructions and the modified instructions were discussed at the conference following closing arguments. Dale continued to vigorously object to instructions 7 and 8 as modified, and finally offered instruction A to correct the prejudicial effect of instructions 7 and 8. As requested, the trial court read instruction A immediately before numbers 7 and 8.

It is apparent there was some confusion in the jury over the order in which it was to consider the evidence in reaching a verdict. During deliberations, the jury asked the court if it was to consider all the evidence, including the

---

admissible evidence unless it is persuaded of the existence of the preliminary fact; further, subdivision (c) requires the judge to give such an instruction whenever he is requested by a party to do so." (29B West's Ann. Evid. Code (1966 ed.) pp. 270-271; Deering's Ann. Evid. Code (1966 ed.) p. 408.)

HLA evidence, *before* deciding the intercourse issue. The court responded that the jury should consider all the evidence in whatever order it wished.[19]

The essence of Dale's complaint here is that the instruction he provided the court at the last moment, read in conjunction with instructions 7 and 8, rendered the instructions as a whole fatally defective, requiring reversal.

It would appear that the culprit in creating the jury's confusion was instruction A which appears to squarely contradict instruction number 7.[20] While instructions 7 and 8 are correct statements of the law and were properly given, instruction A is a broad statement which is misleading (though correct in the sense that the inclusionary result of the HLA test may be considered with all the other evidence on all the issues in the case, including the intercourse issue) in that it appears to include both the inclusionary result and the probability-of-paternity result of the HLA test. ■ "It is well established that it is the responsibility of counsel to propose correct instructions and the court has no duty to modify erroneous instructions submitted to it." (*Zhadan* v. *Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839 [161 Cal.Rptr. 225].) ■ While this instruction was not erroneous, it was certainly misleading. Dale cannot now claim reversible error where the trial court gave the instruction he requested which instruction caused confusion when considered with other instructions. (*Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 567 [140 Cal.Rptr. 330]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 267, pp. 4257-4258.)

Finally, even if the apparent conflict caused by the giving of instructions A, 7 and 8 together constituted error, the trial court's response to the jury's query cured any error and there was no substantial effect on the result. ■ Generally, "[t]he giving of conflicting instructions on a material point is error. [Citations.] Still, it is only where the substantial rights of a party have been affected that a reversal is justified. [Citations.]" (*Finley* v. *City & County of S. F.* (1952) 115 Cal.App.2d 116, 122 [251 P.2d 687]; see also *Lane* v. *Pacific Greyhound Lines* (1945) 26 Cal.2d 575, 586 [160 P.2d

---

[19]The jury's note read: "Your Honor: [¶] As jurors we took an oath that we would examine and discuss *all* of the evidence before reaching a verdict. Are we to consider all evidence (HLA, fertility, and photos of Dale) *prior* to deciding the intercourse issue?" The court's response: "You will consider all of the evidence in what ever [*sic*] order you wish, and you will give it the weight and value you determine it to be worth."

[20]Despite the apparent conflict in these instructions when taken together, they can, nonetheless, be harmonized. Instruction A dealt generally with the jury's application of the HLA test results. It did not specify the inclusionary aspect or the probability-of-paternity aspect of the results. Instructions 7 and 8, on the other hand, specifically concerned the probability-of-paternity results and set out the limitations on the jury's consideration of the HLA test results with respect to the probability-of-paternity statistic. These instructions, when read together, were not contradictory, but in fact, complemented each other.

21]; Code Civ. Proc., § 475.) Since the court's response to the jury's question was favorable to plaintiffs by nearly nullifying the effect of instructions 7 and 8, the error, if any, was not prejudicial because it did not affect the result.

### III-VII*

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment of the trial court is affirmed.

Klein, P. J., and Danielson, J., concurred.

Petitions for a rehearing were denied February 14, 1984, and the petition of appellant minor for a hearing by the Supreme Court was denied March 15, 1984. Mosk, J., did not participate therein.

---

*Not certified for publication, see footnote, *ante,* page 1053.