STATE of Utah, By and Through UTAH STATE DEPARTMENT OF SOCIAL SERVICES, and Mary Turpin, Plaintiffs and Respondents,

v.

Edward L. WOODS, Defendant and Appellant.

No. 860163–CA.

Court of Appeals of Utah.

Sept. 2, 1987.

Mark S. Miner, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., David Tibbs, Asst. Atty. Gen., for plaintiffs and respondents.

Before ORME, GREENWOOD and BILLINGS, JJ.

## OPINION

ORME, Judge:

Appellant Woods seeks reversal of the trial court's holding that he was the father of respondent Mary Turpin's child. Woods contends the court erred in accepting an expert's testimony on the probability of Woods' paternity. Woods claims that the court should not have received the expert's testimony on the results of the HLA blood test because the testimony failed to meet the foundational standards required in *Phillips v. Jackson*, 615 P.2d 1228 (Utah 1980).

### FACTUAL BACKGROUND

A child was born to Mary Turpin on July 22, 1983. Turpin testified at trial that appellant Woods was the father. She testified that she had been dating Woods since the summer of 1982 and that she had intercourse with Woods and no others during the time she could have conceived her child. Woods denied paternity and claimed that he did not have access to Turpin during this period because he had injured his foot and was in the hospital. Subsequent testimony revealed that he had received the injury when kicking in the window of Turpin's family home. Although hospitalized for a time, he was not totally immobilized.

The record also indicated that conception may have occurred before the injury.

Turpin testified that in her ninth month of pregnancy she was diagnosed as having herpes. Woods claimed that since he had not contracted herpes, this was further proof that he was not the father. No expert was called to testify as to the relevance of Turpin's herpes, specifically as to when Turpin became contagious and whether Woods could have had intercourse with her without contracting the disease.

The trial court found Woods' testimony at trial to be generally inconsistent and lacking in credibility. Woods testified that the last time he had had intercourse with Turpin had been in July 1982. Woods testified that in November he was in a body cast and unable to have sexual intercourse. On cross examination Woods conceded that only his foot was in a cast.

Respondent called Dr. Charles DeWitt, an expert in interpreting Human Leucocyte Antigen (HLA) blood tests, to testify as to the results of the tests performed on Turpin, Woods, and one Carlson, Turpin's present husband. Dr. DeWitt is a pathologist at the University of Utah with a Ph.D. in immunology, who testifies some 40 times a year on HLA results.

The HLA test is an antigen marker determination which reveals possible paternity by identifying four antigens in the baby, mother and alleged father. Through a process of matching the expert can exclude a party or predict the probability of paternity of any non-excluded male. Based on Woods' antigen pattern, Dr. DeWitt testified that there was a 94% probability that Woods fathered Angela Turpin.

Woods contested the use of the results of the HLA blood test because he did not think that Dr. DeWitt had been qualified under the standards set forth in *Phillips v. Jackson*, 615 P.2d 1228 (Utah 1980). He also objected because Woods' HLA test had been done before the birth of the Turpin baby in conjunction with another paternity suit. (DeWitt testified that results from an HLA test remain constant over one's life so the date of testing is irrelevant.)

The trial court concluded that Woods was the natural father of Turpin's child, and that he was liable for the reasonable medical expenses relating to the pregnancy and birth and for the necessary care and maintenance of the child. There are two key issues raised on appeal: First, whether the HLA test is generally reliable, and second, whether a proper foundation was laid to admit the results of the particular HLA test in this case.

## GENERAL RELIABILITY AND ADMISSIBILITY OF THE HLA TEST

In 1980, the Utah Supreme Court concluded that Utah Code Ann. § 78–45a–10, a provision of the paternity act concerning use of blood tests, does not "preclude the admissibility of HLA tests if they otherwise meet the relevant legal standards for the admission of scientific evidence." *Phillips v. Jackson*, 615 P.2d at 1233. In *Phillips*, the Utah Supreme Court discussed what standard should determine admissibility of scientific evidence. It acknowledged that a scientific principle is admissible if it is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* Noting that this can be an overly rigorous test, the Court stated that the "paramount concern is, of course, whether the evidence is sufficiently reliable.... Tests that have passed from the experimental stage may be admissible if their reliability is reasonably demonstrable." *Id.*

To insure this reliability, the Court identified six elements that the HLA test must meet in order to be admissible. The first two elements, which are aimed at the general reliability of the HLA test, require the plaintiff to prove: (1) the correctness of the genetic principles underlying the test for determining paternity and (2) the accuracy and reliability of the methods utilized in application of the principle to determine paternity. *See id.* at 1235. The remaining four elements refer to the foundation that must be laid for a particular HLA test and are discussed later.

In the few years since *Phillips* was decided, the reliability of the HLA test has

been refined to the extent that it is now deemed to be the "most precise method of determining paternity in general use today." S. Kolko, *Admissibility of HLA Test Results to Determine Paternity*, 9 Fam.L.Rep. (BNA) 4009 (Feb. 15, 1983). Trained experts can now show that a particular man fathered a child with up to a 99% degree of probability when the HLA test is used in conjunction with other tests. *Id.* By 1983, thirty-five states and the District of Columbia, either by statute or by case law, made the results of HLA testing admissible in determining paternity.[1] *Id.* Five other states allow the use of HLA results to exclude a putative father. *Id.* at 4012. As this data demonstrates, courts have moved from an initial position of mistrust of serologic tests to the present stage of taking "judicial notice of the scientific acceptance" of such tests. E. Cleary, *McCormick on Evidence* 619 (1984).

It is clear the HLA test is no longer in the experimental stage, and that it meets the two general reliability elements of *Phillips.*

By concluding that the test provides accurate and reliable genetic "maps," we do not mean to imply that this test will be *determinative* of the putative father's paternity. The HLA test is but one piece of evidence, and the weight accorded to this evidence lies within the sound discretion of the trial court.[2] *See Everett v. Everett,* 150 Cal.App.3d 1053, 201 Cal.Rptr. 351 (1984); *Dept. of Social Servs. v. Bacot,* 280 S.C. 485, 313 S.E.2d 45 (S.C.App.1984).

## THE FOUNDATION REQUIREMENTS OF *PHILLIPS*

To assist the trier-of-fact in understanding the highly technical HLA test results and the accompanying statistical probabilities the results generate, *Phillips* requires the testimony of a qualified expert witness. 615 P.2d at 1236. The second issue we address pertains to the foundation that must be laid in order to qualify this witness and permit his testimony and the test to be admitted.[3] First, the qualifications of necessary witnesses must be established. *Id.* at 1235. Second, it is necessary to establish that the actual method employed and the particular test used in a given case were performed in accordance with proper procedures and with proper materials and equipment. *Id.*

In addition to these elements, *Phillips* requires the foundation to include, thirdly, the effect of variables which occur in persons of different nationalities or ethnic origins that would influence the accuracy of the test, and, fourthly, any other factors that might tend to invalidate the test or significantly change the probability of accuracy. *Id.*

The Court in *Phillips* held that the appellant failed to properly qualify his expert witness, who happens to have been Dr. DeWitt, primarily because his testimony was too vague and too general. *Id.* at 1236–37. The Court found that Dr. DeWitt did not focus specifically on paternity iden-

---

**1.** By contrast, when the Supreme Court decided *Phillips* in 1980, it found only two courts that had held the HLA test admissible. *Phillips v. Jackson,* 615 P.2d at 1232. *See Malvasi v. Malvasi,* 167 N.J.Super. 513, 401 A.2d 279 (1979); *Comm'r of Social Servs. v. Lardeo,* 100 Misc.2d 220, 417 N.Y.S.2d 665 (1979). Today the test is deemed to be so reliable that at least one state permits its courts "to resolve the question of paternity adversely to the person who refuse[s]" to take an HLA test. *County of El Dorado v. Schneider,* 191 Cal.App.3d 1263, 237 Cal.Rptr. 51, 52–53 (1987). *See also Blackwell v. State,* 475 So.2d 565 (Ala.Civ.App.1985).

**2.** Concerns are often expressed about the propensity of jurors to view scientific test results with undue adoration and to treat as ultimate fact what the test merely points to as a possibili-

ty or a probability. *See, e.g., Everett v. Everett,* 150 Cal.App.3d 1053, 201 Cal.Rptr. 351, 361 (1984) (court instructed the jury to determine the validity of the assumption underlying evidence of probability of paternity and to disregard the evidence if it found it to be invalid). Such concerns are valid, but are not present in the instant situation, since in Utah paternity trials should be to the court. *Hyatt v. Hill,* 714 P.2d 299, 301 (Utah 1986).

**3.** The Superior Court of Pennsylvania, after concluding that the HLA test is reliable, adopted the four remaining elements of *Phillips* stating that "it is axiomatic that a foundation must be laid for the admission of any evidence." *Turek v. Hardy,* 312 Pa.Super. 158, 458 A.2d 562, 565 (1983).

tification; that he did not indicate how the table of percentages on paternity probability were computed; that his testimony did not adequately discuss the significance of the particular genetic markers he relied on; that he did not appear to have the particular knowledge and training required to interpret HLA test results; that his testimony did not supply information of the general acceptance of the HLA test; and that his lab technician, who also testified, did not qualify as an expert to interpret the test results, although she could testify as to the chain of custody of the blood samples drawn from the parties. *Id.* at 1236–37. As a consequence, the Court held in *Phillips* that the HLA test was without proper foundation and its admission constituted prejudicial error. *Id.* at 1238.

An examination of the record in this case shows that the requirements for a proper foundation, as identified in the *Phillips* case, were met.

## *PHILLIPS* REQUIREMENTS MET BY EXPERT TESTIMONY

The initial foundation requirement in *Phillips* is establishing the qualifications of the expert. Dr. DeWitt testified that he has a Ph.D. in immunology and is the associate chairman of the Department of Pathology at the University of Utah where he teaches immunology to medical students. He also heads the HLA typing laboratory at the medical center. In 1964 Dr. DeWitt began a study of HLA typing in connection with the clinical transplantation of organs and tissues which has involved 9000 individuals.

To meet the second *Phillips* foundation requirement, namely that the proper testing procedure and materials were used, Dr. DeWitt explained the laboratory procedure used when an HLA test is done. Dr. DeWitt testified that when a blood sample is drawn from a person, he or she signs an identification sheet, and his or her Polaroid picture is taken and attached to the form. The blood sample is taken with the sheet to the lab or locked in a cabinet until the lab technician can pick it up. He explained that he supervises the lab work on a daily

basis, although he is not necessarily on hand for each test. His lab technicians are required to have a degree or comparable work experience. Dr. DeWitt reviews the worksheets with the test results, then places them in a file cabinet in his office and maintains the records on them.

Dr. Dewitt testified that the particular method he and his trained staff use in performing the HLA test is one that is accepted around the world, and is the one supported by the College of American Pathologists and the National Institute of Health. Over 200 laboratories use it, and it is the test generally accepted in the scientific community.

Dr. DeWitt explained the concept of the HLA test as an antigen marking system that allows the interpreter, through a process of matching the detected antigens of the parties involved, to both exclude and include males as the possible father. Dr. DeWitt discussed in detail the antigens of Woods, Turpin, and the child and the reason for his conclusion that Woods could not be excluded and, indeed, had a high probability of being the biological father.

Addressing the third foundation requirement, Dr. DeWitt also discussed the effect that an individual's racial background or ethnic origin can have on the ability of the HLA test to identify antigens, pointing out that the test was originally designed around Caucasians. He stated that this is a relatively minor point, however, because very few antigens are characteristic of only one race.

As for the fourth foundation requirement, that any other factor that might tend to invalidate the test be discussed, Woods suggests no other factors which should have been considered by Dr. DeWitt.

Another important aspect of Dr. DeWitt's testimony concerned the probability of Woods' paternity. Dr. DeWitt testified as to the calculus used in formulating a paternity index. He used the method advocated by the American Association of Blood Banks. According to his testimony, this method is the one used by the University of California at Los Angeles, the Cleveland Clinic, Johns Hopkins University, and 80

other laboratories. Dr. DeWitt calculated his own probability tables based on this information for Woods. He concluded that compared to a randomly drawn man fathering a child, Woods was fifteen times more likely to be the father of the suspect child. Dr. DeWitt stated that there was a 94% probability of Woods' paternity. This figure was arrived at by combining the results of the HLA test and the ABO blood test.[4]

The decision whether to admit expert testimony ordinarily lies within the discretion of the trial court whose ruling should be sustained unless it is proven that it was clearly erroneous. *Maltby v. Cox Construction Co.*, 598 P.2d 336, 340 (Utah), *cert. denied*, 444 U.S. 945, 100 S.Ct. 306, 62 L.Ed.2d 314 (1979). We find that the testimony of Dr. DeWitt was specific and well-documented and met the admissibility requirements set forth in *Phillips*. We accordingly affirm the court's judgment as to Woods' paternity.

## A POSTSCRIPT ON TACTICS

Counsel for appellant brought to this court's attention a problem concerning expert testimony on the HLA test in paternity suits. According to counsel, Dr. DeWitt is the only HLA expert in the intermountain area. Importing another HLA expert to counter Dr. DeWitt's testimony is costly, he says, the nearest other expert being in Los Angeles, and therefore an economic impossibility in the average case. If true, appellant's counsel is correct that this situation works a distinct disadvantage to those against whom Dr. DeWitt testifies.

While we acknowledge that securing one expert to counter another expert's opinion is often desirable, there are several factors that ameliorate the situation. Counsel may contradict the expert's testimony with information gained from other sources, such as medical treatises and texts. Utah R.Evid. 803(18). As testimony of any HLA test goes only to the probability of paternity, that fact can be emphasized in cross-examination and in argument. For example, if the scenario of this case were replicated

100 times, it is statistically true that the accused would be the father in 94 of the cases. It is equally true that in six of the cases he would not be. Courts have a solemn duty to carefully weigh all the evidence and make sure that those six are vindicated and spared the financial and emotional burdens of a false paternity judgment.

Moreover, as might have been possible in this case, expert testimony of a totally different type can be persuasive. A court would no doubt find probative medical testimony to the effect, for example, that Turpin's herpes were of such vintage and severity that she would have had the condition during the period of her relationship with Woods, and that if she had intercourse with him as often as she said, the possibility of his escaping without contracting herpes was only one in twenty. Expert testimony as to impotency or male infertility would also be available in some cases and, when credited, would be controlling.

Of course, the best way to demonstrate that the defendant in a paternity action is not the father—that he is one of the six in our mythical sample of 100 cases rather than one of the 94—remains what it always has been: to show that defendant has never met the mother in his life; or that he dated her years ago but has not touched her since well before conception; or that he had a frolic or two but never accomplished penetration; or that he really was in the military overseas at all pertinent times. Or even, as once suggested by Woods in this case, that he was in the hospital, in a full-body cast, throughout the period of possible conception.

In this case, the trial court stated that in finding Woods to be the biological father, it relied principally on the testimony and demeanor of Turpin and Woods. It found Turpin to be believable, while Woods was not. The court stated that even without the testimony of Dr. DeWitt, it concluded by a preponderance of evidence that Woods fathered Turpin's child. This highlights

---

**4.** The ABO blood test identifies antigens in the red blood cells and groups blood into four types —A, B, AB, and O. Its reliability and admissibility are long established and are not in issue.

the appropriate utilization of the HLA test and related expert testimony: to bolster a conclusion of paternity to which other, non-scientific evidence firmly points.

GREENWOOD, J., concurs.

BILLINGS, Judge (concurring in result):

Although I concur in the reasoning of the dispositive portions of the majority opinion, I cannot join the section on "trial tactics." I do not believe it appropriate for an appellate court to opine on possible trial strategies particularly when, as here, such a discussion is superfluous to the decision.