J-S34012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARCUS LEONARD WALLACE | |
| Appellant | No. 324 MDA 2015 |

Appeal from the Judgment of Sentence February 2, 2015
In the Court of Common Pleas of Franklin County
Criminal Division at No(s): CP-28-CR-0000213-2010

BEFORE:  PANELLA, J., STABILE, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.                    **FILED AUGUST 16, 2016**

Appellant, Marcus Leonard Wallace, appeals from the judgment of sentence entered after a jury convicted him of, among others, first-degree murder. We conclude that none of Wallace's arguments merit relief, and therefore, affirm.

In the early morning of December 10, 2009, an assailant broke into the bedroom of Consuela Wallace. A relative, sleeping in a neighboring bedroom, heard a loud crash and a male's voice arguing with Consuela. He later identified the male's voice as Consuela's adopted son, Marcus. Responding to the noise, the relative found Consuela lying on the floor of her bedroom, unconscious and bleeding from the head. Consuela later died from the blunt force trauma she had sustained to her head.

Investigators quickly focused on Marcus as a person of interest. Shortly thereafter, Marcus was arrested on an outstanding, unrelated warrant. Pursuant to this arrest, a sample of Marcus's DNA was taken and matched DNA found at the scene of the crime. Furthermore, while incarcerated on the unrelated charges, he provided a confession to the murder to officers who questioned him. He was charged with, among others, the first-degree murder of Consuela.

After lengthy proceedings concerning Marcus's competence to stand trial, a trial on these charges was held in January, 2015. The jury found him guilty of first-degree murder and burglary. Marcus immediately moved for a judgment of acquittal on the grounds of insufficient evidence. The trial court denied the oral motion, and subsequently sentenced Marcus to life imprisonment without parole, with a concurrent term of imprisonment of 10 to 20 years on the burglary conviction. This timely appeal followed.

On appeal, Marcus raises five challenges to his convictions. First, Marcus contends that the evidence at trial was insufficient to sustain a conviction for first-degree murder. We review a challenge to the sufficiency of the evidence as follows.

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every

possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Slocum*, 86 A.3d 272, 275-276 (Pa. Super. 2014) (citation omitted).

"To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill." *Commonwealth v. Burno*, 94 A.3d 956, 969 (Pa., 2014) (citation omitted). "The Commonwealth may use wholly circumstantial evidence to discharge its burden of showing the accused intentionally killed the victim … and circumstantial evidence can itself be sufficient to prove any or every element of the crime …." *Commonwealth v. Perez*, 93 A.3d 829, 841 (Pa. 2014) (citations omitted). Thus, "[s]pecific intent to kill can be

proven where the defendant knowingly applies deadly force to the person of another." **Commonwealth v. Stokes**, 78 A.3d 644, 650 (Pa. Super. 2013) (citation omitted).

Wallace argues that the evidence of an argument between himself and Consuela in the moments before her murder negates any possibility of finding specific intent. However, "the specific intent to kill can be formed in a fraction of a second ...." **Commonwealth v. Chambers**, 980 A.2d 35, 47 (Pa. 2009) (citations omitted). Wallace does not dispute, for purposes of this argument, that he struck Consuela in the head with sufficient force to cause injuries that led to her death. Furthermore, it is undisputed that Wallace drove over a hundred miles that night to Consuela's home and broke into her bedroom late at night. Under these circumstances, the jury was entitled to find that Wallace acted with the specific intent to kill Consuela.

In his next argument, Wallace asserts that police interrogations that occurred while he was imprisoned on unrelated charges violated his right to counsel.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

- 4 -

> Further, [i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

***Commonwealth v. Houck***, 102 A.3d 443, 455 (Pa. Super. 2014) (internal citations and quotations omitted; first brackets in original, second brackets supplied).

The following facts are uncontested for purposes of this appeal. On December 11, 2009, Wallace was arrested in Pittsburgh on an unrelated matter. Wallace was informally arraigned on this charge on December 15, 2009, and filed an application for appointment of counsel. Counsel was appointed to represent Wallace shortly thereafter.

On that same date, while still incarcerated on this unrelated charge, Pennsylvania State Troopers interrogated Wallace regarding the death of Consuela. Wallace concedes that he was provided with ***Miranda***[1] warnings prior to the interrogation. ***See*** Appellant's Brief, at 22. Wallace refused to cooperate, but did not request counsel to be present during questioning.

Approximately one week later, the Troopers returned to question Wallace regarding blood having been found inside a car parked outside his home in Pittsburgh. Once again, Wallace concedes that he was provided with ***Miranda*** warnings. ***See id***. Wallace admitted that he owned the car, but posited that the blood must have been present when he bought the car.

---

[1] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

Wallace argues that the trial court erred in failing to suppress this statement as it was procured in the absence of his court-appointed attorney.

The critical flaw in Wallace's argument is that he fails to distinguish between his right to counsel for trial purposes, which is protected under the Sixth Amendment, and his right to counsel during questioning, which is protected under the Fifth Amendment. These two rights are not co-extensive. *See Commonwealth v. Steward*, 775 A.2d 819, 827 (Pa. Super. 2001). A defendant who has exercised his right to counsel during questioning is entitled to have counsel present at any subsequent questioning while detained, even if the questioning is based upon unrelated charges. *See Commonwealth v. Santiago*, 599 A.2d 200, 202 (Pa. 1991). In contrast, a request for appointment of counsel to defend against criminal charges is offense specific; such a request does not automatically invoke the defendant's right to have counsel present during questioning on unrelated matters. *See Steward*, 775 A.2d at 827.

Here, Wallace requested the appointment of counsel to defend him against the unrelated criminal charges. He did not request that counsel be present for any of the questioning that occurred regarding the murder of Consuela. Thus, the Troopers did not violate his right to counsel when they interrogated him. Wallace's second issue on appeal merits no relief.

Wallace's third issue on appeal concerns the investigators' use of the Combined DNA Index System ("CODIS") to generate a "cold hit" of Wallace

on blood samples taken from Consuela's home. Wallace contends that the search of the CODIS database was an unreasonable search without a warrant. He thus argues that the results should have been suppressed pursuant to the Fourth Amendment. In support of his argument, Wallace highlights *Maryland v. King*, 133 S.Ct. 1958 (2013). *King* proves his argument's undoing.

There, the Supreme Court addressed the legality of Maryland's DNA Collection Act and the constitutionality of the CODIS program. The Act requires law enforcement officials to take a DNA sample, by scraping the inside of the arrestee's cheek with a buccal swab, without a warrant. The officials then run the DNA sample through CODIS to determine whether the sample matches any unsolved crime. The Court held that while this process constitutes a search under the Fourth Amendment, the search was reasonable as the government interest outweighed the intrusion into an individual's privacy.

The Court focused on the importance of the DNA sample in identifying the arrestee. The Court likened using the DNA swab to identify the arrestee to fingerprinting and photographing, explaining, "[f]inding occurrences of the arrestee's CODIS profile in outstanding cases is consistent with this common practice. It uses a different form of identification than a name or fingerprint, but its function is the same." *Id*., at 1972. And noted that "[i]n light of the scientific and statutory safeguards, once respondent's DNA was lawfully

collected the STR analysis of respondent's DNA pursuant to CODIS procedures did not amount to a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment." *Id*, at 1980.

Under *King*, searching the CODIS database for purposes of a criminal investigation, that is, to solve a "cold case," does not violate the Fourth Amendment rights of those persons whose DNA profiles are stored in the database.[2] Wallace's third issue on appeal, therefore, merits no relief.

Next, Wallace contends that the trial court erred in permitting the Commonwealth to present evidence of Wallace's prior bad acts. "[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa. Super. 2012) (citation omitted; brackets in original). In reviewing a court's decision to permit evidence of alleged prior bad acts, we note that it is impermissible to present evidence at trial of a defendant's prior bad acts or crimes to establish the defendant's criminal character or proclivities. *See* Pa.R.E. 404(b); *Commonwealth v. Hudson*, 955 A.2d 1031, 1034 (Pa. Super. 2008). Such evidence, however, may be admissible "where it is relevant for some other legitimate purpose and not utilized solely to blacken the

---

[2] Wallace has not raised a challenge to this question under the Pennsylvania Constitution. We therefore do not reach this issue.

defendant's character." ***Commonwealth v. Russell***, 938 A.2d 1082, 1092 (Pa. Super. 2007) (citation omitted).

Rule 404(b)(2) provides that "[e]vidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Pa.R.E., Rule 404(b)(2). Rule 404(b)(2), however, mandates that other crimes, wrongs, or acts evidence "may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice." Pa.R.E., Rule 404(b)(2); ***see also Russell***, 938 A.2d at 1092. "[O]ur courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development." ***Commonwealth v. Walker***, 656 A.2d 90, 99 (Pa. 1995) (citation omitted).

Wallace challenges five separate items of prior bad act evidence that the trial court admitted at trial: (a) Wallace's unauthorized entry to Consuela's home in 1996; (b) Consuela obtaining a protection from abuse ("PFA") order against Wallace shortly thereafter; (c) Consuela obtaining a second PFA order against Wallace in 1997; (d) Wallace's conviction for defiant trespass and simple assault of Consuela in her home; and (e) the various allegations and statements contained in the relevant applications for PFA orders and police reports.

Wallace argues that since these events occurred between nine and thirteen years prior to the murder of Consuela, they could not have formed part of the chain or sequence of events that led up to the murder. Contrary to Wallace's argument, "there is no time limitation on when [evidence that forms the history of an offense] becomes inadmissible." *Commonwealth v. Drumheller*, 808 A.2d 893, 905 (Pa. 2002) (citing *Commonwealth v. Lilliock*, 740 A.2d 237 (Pa. Super. 1999)). In *Lilliock*, this Court held that a twelve-year-old PFA order was properly admissible to prove motive. *See* 740 A.2d at 245. While Wallace is correct in noting that there was a significant period of time between the acts at issue and the murder of Consuela, this is properly addressed to the weight of the evidence, not its admissibility. *See Commonwealth v. Petrakovich*, 329 A.2d 844, 850 (Pa. 1974). Wallace's fourth argument on appeal merits no relief.

In his final issue on appeal, Wallace contends that the prosecutor misled the jury when discussing the probabilities associated with a false positive result in DNA testing. Wallace asserts that the Commonwealth's expert committed what is known as the "prosecutor's fallacy." "The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." *McDaniel v. Brown*, 130 S.Ct. 665, 670 (2010) (citation omitted). The random match probability is a form of incidence rate statistics.

Thus, a random match probability designates the rate at which the targeted DNA is found in the general, undifferentiated population. ***See id***.

However, the prosecutor's fallacy is a statistical fallacy, not based upon any unique characteristic of DNA or DNA testing. Prior to advent of widespread DNA testing in criminal cases, a scholarly article identified the prosecutor's fallacy in the following manner.

> [A]nectdotal evidence suggests people sometimes make serious errors when evaluating incidence rate statistics. One of the authors recently discussed the use of incidence rate statistics with a deputy district attorney. This experienced prosecutor insisted that one can determine the probability of a defendant's guilt by subtracting the incidence rate of a "matching" characteristic from one. In a case where the defendant and perpetrator match on blood type found in 10% of the population, for example, he reasoned that there is a 10% chance the defendant would have this blood type if he is innocent and therefore concluded there is a 90% chance he is guilty. This assessment is misguided because it purports to determine the defendant's probability of guilt based solely on the associative evidence, ignoring the strength of other evidence in the case.
>
> …
>
> Suppose you are asked to judge the probability a man is a lawyer based on the fact he owns a briefcase. Let us assume all lawyers own a briefcase but only one person in ten in the general population owns a briefcase. Following the prosecutor's logic, you would jump to the conclusion that there is a 90% chance the man is a lawyer. But this conclusion is obviously wrong. We know that the number of nonlawyers is many times greater than the number of lawyers. Hence, lawyers are probably outnumbered by briefcase owners who are not lawyers, and a given briefcase owner is more likely to be a nonlawyer than a lawyer. To draw conclusions about the probability the man is a lawyer based on the fact he owns a briefcase, we must consider not just the incidence rate of briefcase ownership, but also the a priori likelihood of being a lawyer. Similarly, to draw conclusions about the probability a criminal suspect is guilty

based on evidence of a "match," we must consider not just the percentage of people who would match but also the a priori likelihood that the defendant in question is guilty.

The prosecutor's misguided judgmental strategy, which we shall call the Prosecutor's Fallacy, could lead to serious error, particularly where the other evidence in the case is weak and therefore the prior probability of guilt is low. Suppose, for example, that one initially estimates the suspect's probability of guilt to be only .20, but then receives additional evidence showing that the defendant and perpetrator match on a blood type found in 10% of the population. According to Bayes theorem, this new evidence should increase one's subjective probability of guilt to .71, not .90.

William C. Thompson & Edward L. Schumann, *Interpretation of Statistical Evidence in Criminal Trials, The Prosecutor's Fallacy and the Defense Attorney's Fallacy,* 11 LAW & HUM.BEHAV. 167, 170-71 (1987). The Bayes theorem, when utilized for conventional probability, is nearly universally accepted as valid. **See State v. Spann**, 617 A.2d 247, 257 (N.J. 1993). "What is not at all clear is its general acceptance for the purpose of converting what is essentially a non-mathematical conclusion of a prior probability of guilt into a higher probability through the use of the formula." **Id**.

Given this description of the prosecutor's fallacy, we conclude that this issue is more properly addressed to the weight of an expert's testimony, rather than its admissibility. Most appropriately, this issue would be the subject of dueling experts. Even short of this ideal, the expert's awareness of the fallacy and its implications is fertile ground for cross-examination. Of

course, expert testimony that clearly embraces the statistical fallacy can be found to be inadmissible pursuant to *Frye*[3] in an appropriate proceeding.

Here, we have little trouble in determining that the Commonwealth's expert did not succumb to the fallacy. After testifying to his opinion regarding the extraordinarily low probability of a random match, the expert provided the following responses to wrap up cross-examination.

> Q.     And just so we're clear here you're testifying – you've testified before clearly so you understand the jury's job here is to determine guilt or innocence?
>
> A.     It is, yes.
>
> Q.     You're not testifying to guilt or innocence?
>
> A.     No, absolutely not.
>
> Q.     You're testifying to the probability of a match – DNA profile match?
>
> A.     That's exactly right.

N.T., Trial, 1/29/15, at 80. The Commonwealth's expert did not confuse the incidence rate with probability of guilt.

Nor is this a case where the other evidence linking Wallace to the crime was weak. The Commonwealth presented evidence of Wallace's long-standing hostility towards Consuela. The Commonwealth also presented

---

[3] *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). Under *Frye*, novel scientific evidence must be generally accepted in the relevant scientific community before it will be admitted.  Pennsylvania Courts utilize the *Frye* test.  *See Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 30 (Pa. 2012).

evidence that a vehicle owned by Wallace had been seen in the area of Consuela's house on the night of the murder. Wallace's blood was later found on the steering wheel of the car. A witness in the home identified a voice he heard arguing with Consuela moments before her murder as Wallace's. The blood tested was, among others, found on broken glass at Consuela's home and on her bedroom wall. Thus, the jury was entitled to infer that blood found at these locations was not there innocently.

Under these circumstances, we are confident that the Commonwealth did not rely on the prosecutor's fallacy to prove Wallace's guilt. Wallace's final issue on appeal therefore merits no relief.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/16/2016</u>